# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

BEVERLY BAILEY,

        Plaintiff,

                                CIVIL ACTION
    v.                           CASE NO. 11-02344-WGY

UNITED OF OMAHA LIFE INSURANCE
COMPANY,

        Defendant.

## MEMORANDUM AND ORDER

## I.    INTRODUCTION

Beverly Bailey ("Bailey") brought this action under the
Employee Retirement Income Security Act of 1974 ("ERISA"), 29
U.S.C. §§ 1001-1461, against United of Omaha Life Insurance
Company ("United of Omaha") for denying her application for
long-term disability benefits. She seeks recovery of those
benefits.

Bailey, a former legal assistant, began experiencing severe
back pain in August 2009. Her pain, which had been increasing in
severity for over a year, caused her to leave her job on November
5, 2009. After months of treatment involving multiple MRIs and
x-rays, five surgical procedures, and three recommendations for
lumbar fusion surgery, Bailey underwent a lumbar fusion surgery

on August 24, 2010. United of Omaha provided short-term disability benefits to Bailey for the maximum period, November 12, 2009, to February 10, 2010. It denied her application for long-term benefits on July 7, 2010, however, claiming that under the terms of its plan, Bailey's restrictions and limitations did not prevent her from performing her job.

After Bailey brought this action on May 4, 2011, both parties filed cross motions for judgment on the administrative record.

## A. Procedural Posture

On May 4, 2011, Bailey filed a complaint against United of Omaha to recover long-term disability ("LTD") benefits it had denied her. Compl. Recovery Plan Benefits Enforcement Rights ERISA, ECF No. 1. United of Omaha answered on June 6, 2011, Answer, ECF No. 4, and filed the administrative record on August 12, 2011, Notice Filing Admin. R., ECF No. 8. Bailey objected to the record on September 12, 2011, and requested that United of Omaha supplement its original filing with several documents. Pl.'s Objections ERISA R., ECF No. 12. United of Omaha provided the additional documents on October 25, 2011. Am. Notice Filing Admin. R., ECF No. 14. On February 17, 2012, both parties moved for judgment on the administrative record. Pl.'s Wilkins Mot. J. ERISA R., ECF No. 18; Pl.'s Br. Supp. Her Wilkins Mot. J. ERISA R. ("Pl.'s Br. Supp."), ECF No. 19; Def. United Omaha's Mot. J.

2

Admin. R., ECF No. 20; Def. United Omaha's Mot. J. Admin. R.,
Ex. 1, Def. United Omaha's Mem. Supp. Its Mot. J. Admin. R.
("Def.'s Mem. Supp."), ECF No. 20-1. Both parties also filed
oppositions to each other's motions on March 16, 2012. Pl.'s
Resp. Def.'s Mot. J. Admin. R., ECF No. 22; Def. United Omaha's
Resp. Opp'n Pl.'s Wilkins Mot. J. ERISA R., ECF No. 23. This
Court scheduled the cross-motions for hearing on September 28,
2012, Elec. Clerk's Notes, Sept. 5, 2012, ECF No. 28, but the
parties rested on the papers, Elec. Clerk's Notes, Sep. 11, 2012,
ECF No. 29.

## B.    Facts

### 1.    Applicable Provisions of the Benefit Plan

Bailey was employed by the Donati Law Firm, LLP ("Donati"),
as a legal assistant. Pl.'s Br. Supp. 1; Def.'s Mem. Supp. 2.
Donati provided its employees with both short- and long-term
disability insurance coverage, funded by United of Omaha. Pl.'s
Br. Supp. 1; Def.'s Mem. Supp. 2. The short-term disability
("STD") covers the first thirteen weeks of disability and states
that:

Disability and Disabled means that because of an Injury
or Sickness, a significant change in Your mental or
physical functional capacity has occurred in which You
are:

(a) prevented from performing at least one of the
Material Duties of Your Regular Job on a part-time
or full-time basis; and

3

> (b) unable to generate Current Earnings which
> exceed 99% of Your Weekly Earnings due to that
> same Injury or Sickness.

Admin. R. at 42, ECF No. 8. "Regular Job means the occupation

You are routinely performing when Your Disability begins." Id.

at 44.

LTD is defined using substantially the same language, though

"Regular Occupation" is substituted for "Regular Job." Id.

at 437. As defined, a "Regular Occupation" is:

the occupation You are routinely performing when Your
Disability begins. Your regular occupation is not
limited to the specific position You held with the
Policyholder, but will instead be considered to be a
similar position or activity based on job descriptions
included in the most current edition of the U.S.
Department of Labor Dictionary of Occupational Titles
(DOT). . . . To determine Your regular occupation, We
will look at Your occupation as it is normally performed
in the national economy, instead of how work tasks are
performed for a specific employer, at a specific
location, or in a specific area or region.

Id. at 439. The LTD policy includes an explanation of how claims

are paid, stating that "[b]enefits will be paid monthly after We

receive acceptable proof of loss." Id. at 432.

Additionally, the policy includes a section on United of

Omaha's "Authority to Interpret Policy," stating in relevant part

that Donati "delegated to [United of Omaha] the discretion to

determine eligibility for benefits and to construe and interpret

all terms and provisions of the Policy. Benefits under the

Policy will be paid only if We decide, after exercising Our

4

discretion, that the Insured Person is entitled to them."  Id.
at 397.

### 2. Bailey's Medical History

#### a. Bailey's History Prior to Filing for Disability Benefits

On August 17, 2009, Bailey saw Dr. Francis X. Camillo ("Dr. Camillo") to address her history of pain in her low back, groin, and anterior thigh.  Id. at 117.  This pain, which began several years prior, had increased in intensity over the past six months. Id.  To relieve her pain, Bailey had taken Lortab and Oxycodone and had undergone physical therapy and epidural injections, none of which improved her condition.  Id. at 118.  During her intake and physical, Dr. Chris Galjour noted that she had "a normal gait without antalgia" and "5/5 strength in her hip flexors, quadriceps, hamstrings, tibialis anterior, gastroc-soleus, EHL and FHL bilaterally."  Id.

Similarly, Dr. Camillo's examination showed Bailey had "5/5 motor strength with no sensory deficits," as well as "some lordosis and tenderness to palpation."  Id. at 119.  Dr. Camillo also reviewed Bailey's MRI, stating that he did not "see any significant stenosis," but he did report "a significant amount of facet arthritis in her back at the 4-5 level."  Id.  X-rays taken that day showed "grade 1 lishesis at 4-5 with some angulation there."  Id.  Dr. Camillo did not recommend surgery at that time,

5

instead suggesting that Bailey return with her husband to discuss the possibility of a 4-5 fusion surgery. Id.

Bailey's next appointment with Dr. Camillo occurred on October 30, 2009. Id. at 121. Dr. Camillo noted that her condition had not improved and discussed with Bailey and her husband what fusion surgery would entail. Id. While he stated that fusion surgery "more than likely will help her," he first ordered a "work-up" for the fusion, including a differential spinal examination, a discogram, and an MRI. Id.

## b. Bailey Ceases Work and Seeks Additional Medical Treatment

On November 4, 2009, Bailey ceased work due to her back pain. Pl.'s Br. Supp. 2. The next day, she underwent a differential spinal surgical examination. Admin. R. at 212. Dr. Camillo stated in his Attending Physician Statement from November 11, 2009, that although Bailey "may not work" after the surgery, she should be able to work full-time within one to three months. Id. Approximately one month later, on December 8, 2009, Bailey was diagnosed with "multi-level degenerative disc disease" and underwent a discogram with the purpose of "identify[ing] her pain generator source." Id. at 108. A dye injection showed what "appeared to be a posterolateral herniation into the foramen" at L4-5. Id. at 109.

On January 4, 2010, Bailey met with Dr. Camillo a third time. Id. at 149. Upon reviewing the discogram, Dr. Camillo

6

stated that it confirmed "discogenic pain at L4 and L5." Id. Although Dr. Camillo again discussed the fusion surgery with Bailey and her husband, he did not schedule surgery because her husband did not want her to have the surgery. Id. Dr. Camillo then referred Bailey to Dr. Keith Williams ("Dr. Williams"). Id. Dr. Williams evaluated Bailey on February 10, 2010. Id. at 461. At that time, Bailey reported constant back pain and bilateral leg pain. Id. Dr. Williams also recommended a level 2 (lumbar) fusion. Id. at 461, 694. On February 17, 2010, Bailey met with Dr. Camillo to discuss Dr. Williams's recommendation and to reiterate her desire to proceed with surgery. Id. at 694. At that time Bailey walked with a cane, had difficulty sitting, and experienced "a lot of pain." Id.

Bailey received another opinion on April 22, 2010 from Nurse Practitioner Robbie Lowery ("Lowery"). Id. at 489. Bailey complained of lower back pain, particularly when "walking more than 50 feet, standing or bending." Id. Lowery stated that this pain "seemed to have occurred after participating in a vigorous exercise program during which she experienced a 50-pound weight loss." Id. After discussion with Dr. Michael Muhlbauer ("Dr. Muhlbauer"), he recommended further evaluation, including an MRI. Id. at 491.

Bailey again visited Lowery on May 6, 2010. Id. at 493. "[T]here was no change in her physical exam" from April 22, 2010.

7

Id. Lowery took an MRI scan of her lumbar spine, which
demonstrated "[a]dvanced facet degenerative changes at L4-5 and
L5-S1 without significant spinal canal stenosis or foraminal
compromise. The remainder of the MRI scan was unremarkable."
Id. Lowery recommended a L4-5 bilateral facet block, as well as
aqua therapy to reduce her total body weight. Id. at 494. Dr.
Muhlbauer concurred in this course of treatment. See Id.

### c. Bailey Completes a Course of Conservative Treatment and Undergoes Surgery.

The bilateral facet block at L4-5 and L5-S1 relieved
Bailey's pain for one week, but symptoms reoccurred such that she
was "staying in [] bed the majority of the day secondary to
pain." Id. at 495. At a follow-up appointment on June 3, 2010,
Bailey was still walking with a cane. Id. Her motor examination
was a "5/5 throughout," she had no limitation of range of motion
of her hip joints, and her spinal axis revealed no deformity or
paraspinous muscle spasm. Id. Lowery recommended a repeat
bilateral facet block and a trial treatment of Neurontin. Id. at
496. Lowery also stated that he would refer Bailey to "Dr. Jenny
Weaver for possible bariatric surgery[1] and participation in
aquatic therapy" and suggested that she see "her primary care
physician for possible treatment for depression." Id.

---

[1] Bailey's insurance carrier denied her claim for her
bariatric surgery evaluation. Id. at 497.

8

On July 15, 2010, after her second bilateral facet block, Bailey again saw Lowery. Id. at 497. Although "there was no change in her physical examination," id., both Lowery and Dr. Muhlbauer "felt the best course of action would be bilateral facet rhizotomy," id. at 498. A third physician, Dr. Autry Parker, concurred in this recommendation. Id. Lowery noted that if this rhizotomy was unsuccessful, "consideration would be given for surgical management," and both physicians "stressed the need for her to undergo some type of bariatric surgery or weight loss program." Id.

Two days later, Dr. Muhlbauer filled out a "Residual Functional Capacity Questionnaire." Id. at 502. On this questionnaire, Dr. Muhlbauer noted that Bailey could not regularly work an eight-hour day for five days per week, that lifting and carrying were affected by the impairment such that Bailey could not lift more than ten pounds, and that Bailey, who was using a cane, could not stand or walk for more than two hours total. Id. Additionally, Bailey could not sit for more than three hours within one eight-hour work day. Id. at 503. Dr. Muhlbauer based these findings upon his previous examinations. Id. at 504.

Bailey underwent a third procedure that year, a bilateral facet rhizotomy, on July 19, 2010. Id. at 518. At her follow-up evaluation on August 3, 2010, Bailey told Lowery that she "had

9

not seen any improvement in her painful condition" and "wanted surgery for definitive treatment." Id. Lowery noted that "[h]er pain seemed to be worsening. She described a burning/aching/grabbing constant pain" in her lower back, as well as aching and constant pain in her legs. Id. Her prescription Percocet was ineffective, and "[s]he could not find a position of comfort." Id. Bailey's motor examination was a 5/5, but her range of motion in "her lumbar spine was limited in all directions." Id. Both Lowery and Dr. Muhlbauer recommended surgery based on Bailey's "failure to respond to conservative treatment over the past six months." Id. at 519.

Prior to Bailey's surgery, her diagnosis was: (1) "degenerative facet sublaxtion, L4-5"; (2) "left leg pain"; and (3) "severe facet arthropathy." Id. at 478. On August 24, 2010, Dr. Muhlbauer performed the lumbar fusion, noting that Bailey had "severe degenerative arthritis." Id. at 479. Bailey was then discharged to a rehabilitation facility on August 27, 2010, to follow up with Dr. Muhlbauer in two to three weeks. Id. at 481. Additionally, occupational and physical therapy were suggested. See id. at 481.

## 3. Administrative Proceedings

### a. Bailey Receives STD Benefits

Bailey applied for STD benefits beginning November 5, 2009, and United of Omaha granted her benefits from November 12, 2009,

to December 17, 2009. Id. at 191. On February 2, 2010, United of Omaha denied her request for an extension of benefits beyond December 16, 2009, basing its decision on her STD application, her medical records, and a peer review discussion with Dr. Camillo. Id. at 104.

Dr. Vicki Kalen ("Dr. Kalen"), employed by Reliable Review Services, completed her peer review of Bailey's application on January 28, 2010. Id. at 60-63. According to her report, Dr. Kalen found that "[t]he only positive findings are inconsistent reports of pain in her low back and legs, moderate degenerative joint disease at L4-5, and a [sic] flexion/extension x-rays showing Grade I listhesis at L4-5." Id. at 62. After acknowledging that "[t]he claimant has moderate degenerative changes primarily at L4-5 and less so at L5-S1," she stated that "the restrictions and limitations placed upon the claimants [sic] work activities by the attending physician(s) are not reasonable and consistent with medical findings." Id. To come to this conclusion, Dr. Kalen consulted "the MRI findings, x-ray findings, pain diagrams, physical examination of August 17, 2009, and conversation with Dr. Camillo." Id. She stated that she and Dr. Camillo were "in total agreement" that these medical records signaled only "some degenerative changes of a moderate degree in her lumbar spine." Id. at 63.

11

Bailey appealed the initial denial of an extension of benefits. See id. at 56. On February 2, 2010, Donati provided United of Omaha with additional information about Bailey's job description, including that she must "pull and lift files that weigh up to 25 lbs." Id. at 80. Although United of Omaha originally classified Bailey's position as one requiring light work capacity, including lifting up to twenty pounds, upon learning that Bailey was required to lift twenty-five pounds, it classified Bailey's position as a medium category. Id. at 54. Further, because Bailey could not lift more than twenty pounds, she was unable to complete her regular job. Id. Therefore, on May 7, 2010, United of Omaha overturned its decision and granted Bailey's request for an extension of benefits through February 10, 2010. Id. at 46.

## b. Bailey Is Denied LTD Benefits

In May 2010, Bailey applied for LTD benefits. Id. at 533. While considering whether to grant Bailey's application, United of Omaha sent Bailey's file to a case management nurse, Nancy Rosenstock, RN ("Rosenstock"), for review. Id. at 707-08. Rosenstock considered the medical records provided to United of Omaha and concluded in June 2010 that Bailey could perform her duties as specified by the Department of Labor ("DOL") and that her restrictions and limitations were unsupported. Id. at 708-09.

12

Ultimately, United of Omaha denied Bailey's LTD benefits request on July 7, 2010. Id. at 526-29. It used the following information to make its decision: (1) Dr. Camillo's Attending Physician Statement on November 11, 2009; (2) Dr. Camillo's "progress notes, diagnostic imaging, and response to clarification letter" from August 17, 2009, to February 4, 2010; (3) Dr. Kalen's peer review on January 28, 2010; (4) Dr. Muhlbauer's and Lowery's notes from April 22, 2010, to May 6, 2010; (5) Bailey's MRIs on June 4, 2009, and May 6, 2010; (6) the discogram performed on December 8, 2009; and (7) the laboratory tests performed from November 4, 2009, to December 3, 2009. Id. at 526-27.

United of Omaha stated in its letter that upon reviewing Bailey's updated medical history, the information did "not appear to contradict the PEER review assessment/rationale." Id. at 527. According to United of Omaha, because Bailey could perform her job as defined by the DOL, the restrictions and limitations ordered by her treating physicians did "not appear to be supported," and thus "[i]n summary, the documentation we have in file does not support disability from your occupation." Id.

Bailey appealed her denial on August 19, 2010, and enclosed a copy of her medical records from Dr. Muhlbauer. Id. at 488. She also notified United of Omaha that she was scheduled for surgery and explained her anticipated recovery period. Id.

13

United of Omaha then sent letters on September 3, 2010, to
Baptist Memorial Hospital and Dr. Muhlbauer. Id. at 485, 486.
United of Omaha asked Baptist Memorial Hospital to send records
"for any treatment from November 1, 2009[,] through the present
date." Id. at 485. United of Omaha requested from Dr. Muhlbauer
a copy of Bailey's medical records between August 3, 2010, and
September 3, 2010. Id. at 486. United of Omaha notified Bailey
that it had requested this additional information and explained
that if Bailey had been treated at Campbell Clinic after January
4, 2010, she should notify United of Omaha. Id. at 487.

United of Omaha again referred Bailey's case to a case
management nurse, Beth Beumer-Anderson, RN ("Beumer-Anderson").
See id. at 694. Beumer-Anderson reviewed the existing
information, as well as additional records obtained during the
appeal process. Id. at 695-97. Beumer-Anderson concluded that
Bailey's April office visits, her updated MRI in May, and her
June office visit showed no change in her motor strength, her
degenerative changes, or her sensation, even though she was
walking with a cane. Id. at 696. Beumer-Anderson also reviewed
Bailey's medical records for factors indicating a longer
disability for disk degeneration and concluded that none were
supported by medical findings. Id. at 697. Finally,
Beumer-Anderson stated that prior to August 3, 2010, any
restrictions on Bailey's movement would not prevent her from

14

performing her light-duty job (as defined by the vocational staff). Id. As of August 3, 2010, however, Bailey's condition had deteriorated sufficiently that she was disabled from this date through the recovery period after her surgery. Id.

Based upon Beumer-Anderson's review, United of Omaha denied Bailey's appeal on October 15, 2010. Id. at 459. It stated that Bailey's complaints of pain were "inconsistent with the physical examinations and the medical evidence." Id. at 463. Moreover, though United of Omaha acknowledged Bailey's surgery and mandatory recovery period, it stated that "since you were not actively employed prior to that surgery, nor were you disabled as defined by your policy, you are not eligible for benefits." Id. Having denied Bailey's appeal, United of Omaha informed her that she had exhausted all of her administrative remedies and was entitled to bring a civil action under section 502(a) of ERISA. Id.

## C.   Federal Jurisdiction

ERISA grants this Court exclusive jurisdiction under 29 U.S.C. section 1132(e).

## II.   ANALYSIS

### A.   Standard of Review

Generally, courts review an administrator's decision on ERISA claims for benefits de novo, unless the plan documents grant discretion to that administrator. Firestone Tire & Rubber

15

Co. v. Bruch, 489 U.S. 101, 115 (1989); see Perez v. Aetna Life
Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998) (en banc). Those
documents must contain language clearly granting such discretion
to the administrator. Shelby Cnty. Health Care Corp. v. S.
Council of Indus. Workers Health & Welfare Trust Fund, 203 F.3d
926, 933 (6th Cir. 2000). Where, as here, discretion is clearly
granted, this Court uses the "arbitrary and capricious" standard.
Id. (internal quotation marks omitted).

    Under the arbitrary and capricious standard, the
administrator's decision is given deference and will be upheld
"if it is the result of a deliberate, principled reasoning
process and if it is supported by substantial evidence." Baker
v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140,
1144 (6th Cir. 1991) (per curiam). Administrator decisions are
not arbitrary and capricious if they are "rational in light of
the plan's provisions." Daniel v. Eaton Corp., 839 F.2d 263, 267
(6th Cir. 1988); see also Davis v. Ky. Fin. Cos. Ret. Plan, 887
F.2d 689, 693 (6th Cir. 1989) ("When it is possible to offer a
reasoned explanation, based on the evidence, for a particular
outcome, that outcome is not arbitrary or capricious." (quoting
Pokratz v. Jones Dairy Farm, 771 F.2d 206, 209 (7th Cir. 1985),
abrogated on other ground by Petrilli v. Drechsel, 910 F.2d 1441,
1445 (7th Cir. 1990)) (internal quotation marks omitted)).

The Court must be mindful of conflicts of interest, however, which are inherent when the administrator making the determinations also pays beneficiaries out of its own assets. Miller v. Metro. Life Ins. Co., 925 F.2d 979, 984 (6th Cir. 1991) (noting than when an insurance company, acting as fiduciary of the plan, pays the beneficiaries out of its own assets, "its fiduciary role lies in perpetual conflict with its profit-making role as a business"). Other "[i]ndicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, [and] bad faith." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002); see also Moon v. Unum Provident Corp., 405 F.3d 373, 381 (6th Cir. 2005) (concluding that "a selective review of the administrative record" is arbitrary and capricious).

Both parties agree that the plan documents at issue here clearly grant the administrator discretion to determine eligibility for benefits and to construe the terms of the plan. Pl.'s Br. Supp. 7; Def.'s Mem. Supp. 12. Therefore, the arbitrary and capricious standard applies. In its review, this Court is limited to considering the administrative record. See Schwalm v. Guardian Life Ins. Co. of Am., 626 F.3d 299, 308 (6th Cir. 2010) ("A court may consider only that evidence presented to the plan administrator at the time he or she determined the employee's eligibility in accordance with the plan's terms.").

## B.    Conflict of Interest

This Court must first determine whether United of Omaha labored under a conflict of interest impeding its ability reasonably to determine Bailey's eligibility for LTD benefits. Where the administrator determines both eligibility for benefits and pays the benefits claims, a conflict of interest exists. Helfman v. GE Grp. Life Assurance Co., 573 F.3d 383, 392 (6th Cir. 2009). United of Omaha engages in this dual decisionmaking and, therefore, has a conflict of interest.

Additionally, where insurance companies routinely employ independent physicians, as here, those physicians "may have an 'incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements.'" Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003) (quoting Regula v. Delta Family-Care Disability Survivorship Plan, 266 F.3d 1130, 1143 (9th Cir. 2001), vacated on other grounds, 539 U.S. 901 (2003) (mem.)). Thus, United of Omaha's decision must be viewed "with some skepticism." See Moon, 405 F.3d at 382.

This skepticism must be tempered, however, by the lack of evidence in the record beyond United of Omaha's financial stake and its employment of independent physicians. See Monks v. Keystone Powdered Metal Co., 78 F. Supp. 2d 647, 664 (E.D. Mich. 2000) (Rosen, J.) (deeming a defendant's benefit determination

18

proper under arbitrary and capricious review because "[t]here [was] simply nothing in th[e] record to suggest that Defendant's decision was motivated or influenced by its financial interest in minimizing Plan payouts"). Bailey has offered no evidence to suggest that either United of Omaha's financial interest or that of its independent physicians skewed its determination. See Kalish v. Liberty Mut./Liberty Life Assurance Co. of Bos., 419 F.3d 501, 508 (6th Cir. 2005) (rejecting the plaintiff's conflict of interest argument where the plaintiff "offered only conclusory allegations of bias"). Overall, United of Omaha's conflict of interest is but one factor this Court will consider throughout its analysis.

## C. United of Omaha's Decision to Deny LTD Benefits Was Arbitrary and Capricious

Bailey attacks United of Omaha's decision on several grounds. First, she argues that its distinction between "Regular Job" and "Regular Occupation" is improper. Second, she asserts that United of Omaha's use of file review, without conducting a physical examination, was arbitrary. Finally, she claims that the three file reviews were too conclusory to be given weight. Taken as a whole, and viewed in light of United of Omaha's conflict of interest, she argues, the denial was arbitrary and capricious. This Court addresses each argument in turn.

19

## 1. Relevant Terms of the Plan

As discussed above, Bailey does not dispute United of Omaha's discretion to interpret the terms of its plan. What she does dispute is its distinction between "Regular Job" and "Regular Occupation," calling it "a distinction without a difference." Pl.'s Br. Supp. 2 n.1. This Court disagrees, noting the plan's two distinct definitions. While both begin with identical language, the plan's description of "Regular Occupation" goes further:

> Your regular occupation is not limited to the specific position You held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). . . . To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region.

Admin. R. at 439. United of Omaha was perfectly reasonable in deciding to review Bailey's medical evidence in the context of her regular occupation rather than her regular job. This Court defers to United of Omaha in its use of this term and will not consider this a factor in its overall determination of whether United of Omaha acted arbitrarily and capriciously.

## 2. United of Omaha's Use of File Review Without Physical Examination

United of Omaha relied on three file reviews to determine that Bailey was not eligible for LTD benefits. United of Omaha

20

first looked to Dr. Kalen's initial peer review from January 2010, written during its STD benefits investigation. It then conducted two additional file reviews in June and October 2010 through in-house case management nurses.

There is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," Calvert v. Firstar Fin., Inc., 409 F.3d 286, 296 (6th Cir. 2005), and "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly," id. at 295. Singular reliance on a physician's file review without a physical examination, however, can "raise questions about the thoroughness and accuracy of the benefits determination." Id.; see also Helfman, 573 F.3d at 393.

United of Omaha reserved the right to obtain a physical examination but failed to exercise it. See Admin. R. at 432, 437. Dr. Kalen looked only at the medical record provided to her, though she did speak with Bailey's treating physician, Dr. Camillo. Similarly, neither Rosenstock nor Beumer-Anderson conducted a physical examination; instead, they merely reviewed the medical evidence updated after Dr. Kalen's initial review.[2]

---

[2] Bailey also attacks these case management nurse reviews by arguing that using "a nurse's review subverts the ERISA claims regulations." Pl.'s Mem. Supp. 14. Specifically, Bailey refers to the requirement that the benefits administrator "shall consult with a health care professional who has appropriate training and

21

Thus, United of Omaha's procedure of relying on these reports

alone, in light of the conflicts of interest present, was

questionable. See Smith v. Cont'l Cas. Co., 450 F.3d 253, 264

(6th Cir. 2006) (holding that the insurance company's "decision

to not perform [a physical] examination supports the finding that

their determination was arbitrary").

### 3.   The Substance of the Three File Reviews

The content of United of Omaha's three medical reports is

similarly questionable.   First, Dr. Kalen's initial report

consists of a one-page clinical history, one page of answers to

six review questions, a one-sentence summary of Dr. Kalen's

discussion with Dr. Camillo, and a two-sentence assessment and

rationale.   Admin. R. at 60-63.   Within this limited space, Dr.

Kalen uses only conclusory statements and underdeveloped

assertions to recommend denying Bailey's application for an

extension of benefits.   For example, question three of her report

required Dr. Kalen to answer whether "the restrictions and

limitations placed upon the claimants [sic] work activities by

---

experience in the field of medicine involved in the medical
judgment."   29 C.F.R. § 2560.503-1(h)(3)(iii).   This Court finds
unpersuasive Bailey's argument that a registered nurse or a nurse
practitioner is somehow less of a "health care professional who
has appropriate training and experience in the field of medicine"
simply because he or she is not a doctor.   And the Sixth Circuit
agrees.   See Iley v. Metro. Life Ins. Co., 261 Fed. App'x 860,
864 (6th Cir. 2008); see also Lanier v. Metro. Life Ins. Co., 692
F. Supp. 2d 775, 790 (E.D. Mich. 2010) (Lawson, J.).

22

the attending physician(s) [are] reasonable and consistent with thee medical findings?" Id. at 62. She concludes that Dr. Camillo's restrictions and limitations are not reasonable and consistent with medical findings without much more than stating that "[t]he claimant has a fairly unremarkable MRI and only mild to moderate findings on x-ray." Id. at 62. Similarly, Dr. Kalen concludes -- without explanation -- that Bailey "did not have any physical or functional impairments that would have prevented" Bailey from performing her occupation. Id.

Second, Dr. Kalen reports that during her conversation with Dr. Camillo, he agreed that Bailey was capable of working. Id. at 63. This directly contradicts Dr. Camillo's signed Attending Physician's Statement, dated November 11, 2009, that Bailey "may not work." Id. at 212. United of Omaha rightfully points out that Dr. Camillo also indicated that, within one to three months, Bailey would be ready to return to full-time employment, and Dr. Kalen spoke with Dr. Camillo two months after the Attending Physician's Statement. Id. at 62-63. Therefore, it is possible that by January 2010 Dr. Camillo agreed with Dr. Kalen's assessment. What is possible, however, is not necessarily true. Dr. Kalen summarizes their five-minute discussion and her medical findings in three sentences, and the reasoning behind her assessment is underdeveloped and therefore unclear. See Rabuck v. Hartford Life & Accident Ins. Co., 522 F. Supp. 2d 844, 880

23

(W.D. Mich. 2007) (Scoville, M.J.) (finding that when an independent physician's summary of his discussion with a treating physician is incompatible with the treating physician's prior written statements, disregarding those written statements constitutes arbitrary and capricious decisionmaking).

Third, Rosenstock's review on June 24, 2010, contains little information explaining her recommendation. In her two-page report, Rosenstock details Bailey's medical history, including new medical information provided after Dr. Kalen completed the initial peer review. Admin. R. at 708-09. After this summary, Rosenstock merely states that "[a]dditional medical information received . . . does not appear to contradict Dr. Kalen's Assessment/Rationale." Id. at 709. Based upon this statement, Rosenstock concludes that "restrictions and limitations do not appear to be supported." Id. Nowhere does Rosenstock provide a description of how she came to this conclusion, nor does she reconcile this conclusion with contradictory medical evidence.

Finally, Beumer-Anderson's second case management nurse review on October 6, 2010, contains many of its predecessors' flaws. Although Beumer-Anderson describes the medical evidence she used to make her determination, she does not state why that evidence supports her conclusion that Bailey's restrictions and limitations are unsupported. See id. at 695-97. Further, she reports that Bailey's pain reports have been inconsistent with

24

physical examination, while simultaneously acknowledging that
neither she nor any other reviewer was privy to those physical
examinations. Id. at 697; see Calvert, 409 F.3d at 296-97
("Where, as here, however, the conclusions from [a file] review
include critical credibility determinations regarding a
claimant's medical history and symptomology, reliance on such a
review may be inadequate." Id. at 297 n.6). Moreover,
Beumer-Anderson creates a list of restrictions and limitations
which she claims, without explanation, would not prevent Bailey
from performing her regular occupation. Admin. R. at 697.
According to Beumer-Anderson, only when Dr. Muhlbauer scheduled
Bailey's surgery were Bailey's restrictions and limitations
appropriate. Id.

Overall, these three reports do not evidence a deliberative
and principled reasoning process on the part of United of Omaha.
See Bennett v. Kemper Nat'l Servs., Inc., 514 F.3d 547, 556 (6th
Cir. 2008) (highlighting the court's "serious concern that the
final denial letter fails to explain the reasons for [the
insurance company's] decision"). Additionally, in its two denial
letters, United of Omaha spent the majority of its letter
explaining the plan terms and the medical evidence it reviewed.
Admin. R. at 459-64, 526-29. After this explanation, it then
stated simply that "based on the above medical analysis,
restrictions and limitations do not appear to be supported." Id.

at 527. This is not enough. See Bennett, 514 F.3d at 556 (holding an insurance company's statement that it "did not believe that the submitted documents contained 'sufficient medical evidence . . . to substantiate a significant functional impairment that would prevent [the plaintiff] from performing the essential functions of any occupation' . . . reads like a conclusion, not a 'deliberate, principled reasoning process,'" id. (citation omitted) (quoting Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006), aff'd sub nom. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008))). Based upon the above discussion, this Court holds United of Omaha's decisionmaking process to be arbitrary and capricious.

## D. Remedy

In ERISA cases, courts possess considerable discretion in choosing whether to remand the case to the administrator to re-evaluate the claimant's case or to award the benefits outright. Kovach v. Zurich Am. Ins. Co., 587 F.3d 323, 339 (6th Cir. 2009). The Sixth Circuit "has frequently awarded benefits outright in lieu of a remand," id., when the claimant was denied benefits to which he or she "was clearly entitled," Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 622 (6th Cir. 2006) (quoting Buffonge v. Prudential Ins. Co. Am., 426 F.3d 20, 31 (1st Cir. 2005)) (internal quotation mark omitted). When "the 'problem is with the integrity of [the plan's] decision-making process,'" id.

26

(alteration in original) (quoting Buffonge, 426 F.3d at 31),
however, "the appropriate remedy generally is remand to the plan
administrator," id.

Here, while this Court has found that United of Omaha's
decisionmaking process was arbitrary and capricious, Bailey is
not "clearly entitled" to the benefits United of Omaha has denied
her. Accordingly, this Court remands the matter to United of
Omaha to complete a full and fair review of Bailey's medical
evidence consistent with this Opinion.

## III. CONCLUSION

For the foregoing reasons, this Court ALLOWS Bailey's motion
for judgment on the administrative record, ECF No. 18, DENIES
United of Omaha's motion for judgment on the administrative
record, ECF No. 20, and REMANDS the case to United of Omaha for
proceedings consistent with this opinion.

**SO ORDERED.**

William G. Young
WILLIAM G. YOUNG[3]
DISTRICT JUDGE

Dated: March 27, 2013

_____

[3] Of the District of Massachusetts, sitting by designation.
Elec. Clerk's Notes, June 21, 2012, ECF No. 24.

27